Grafton, ⎱
Jan. 6, 1914. ⎰

## WOBURN NATIONAL BANK  v.  WILLIAM A. WOODS & a.

In order to create a secret trust of the nature denounced by the law, there must be some agreement or mutual . understanding, expressed either by language or by conduct, whereby the transaction in question is different from what it appears.

Where a grantee in fee understood that he was loaning money and accepting a conveyance of realty as security therefor, while the grantor intended to effect an absolute sale and transfer of the property, the transaction does not disclose a secret trust and is not voidable at the suit of the grantor's creditors.

The mutual assent which is essential to the formation of a contract is to be ascertained from the intention of the parties as expressed in their language and conduct, and not from their undisclosed purposes or secret understanding; and when such words and acts show a complete agreement and a full execution of the contract, their effect is not destroyed by proof that one party misapprehended the legal consequences of what both said and did.

A contract entered into under a unilateral mistake as to its legal effect is not nullified thereby, and if voidable, can be so treated only at the option of the party who acted upon an erroneous belief.

A party is not precluded from introducing competent testimony as to a material issue because such evidence tends to contradict another witness called by him.

BILL IN EQUITY, brought by an attaching creditor of William A. Woods, and seeking to have land standing in the name of Adeline B. Woods decreed to be the property of William. Trial by the court. Upon the facts hereinafter stated, it was found that the bill should be dismissed. Transferred from the September term, 1911, of the superior court by *Chamberlin*, J., on the plaintiff's exceptions to the findings and to the admission of certain testimony.

In March, 1911, William was the owner of a lot of land in Bath which was worth a little more than $1,000. He was financially embarrassed and desired to borrow $1,000 of his mother, Adeline, or of his brother, Harry Woods. Adeline sent Harry to Woburn, Massachusetts, to see what arrangements could be made, Harry and William agreed that the lot should be sold to Adeline for $1,000, and a deed was executed. Harry returned to New Hampshire and explained the transaction to his mother, who expressed satisfaction therewith, raised $1,000 and sent it to William, and put the deed on record. So far as William and Harry knew, the transaction was closed.

The findings continue as follows:

"I cannot find that Adeline B. Woods ever really understood the legal import of this transaction. William made an application to her to borrow $1,000, and she never separated this idea in her mind from the transaction, which was an actual sale. She and Harry and William all acted in good faith, without any intention of defrauding, hindering, or delaying creditors; but I find that their minds never actually met upon the transaction as it appears from the papers. Adeline, without comprehending fully the transaction entered into by William and Harry, whom she sent to Massachusetts to effect a loan, would at any time have reconveyed this real estate to William, had he paid her $1,000 and interest. William never understood this, never supposed he had any right to any such conveyance, and never supposed he was in any way indebted to his mother in consequence of $1,000 received by him for the real estate. This understanding of the matter was the understanding of Harry Woods.

"I cannot find, as requested by the plaintiff, that Adeline understood that William actually promised to make payment of $1,000; and Harry, who acted for her, did not understand any such thing. No such promise was made by William. So far as it is a question of fact, I find that in this matter William, Harry, and Adeline acted in good faith, without any intention to hinder, delay, or defraud creditors of William; that William's property at the time of the transaction, when he received $1,000 and conveyed the land to his mother, was in no way depreciated by that transaction. He received fully fair consideration for the real estate."

The defendant Adeline testified by deposition that she understood the transaction as a loan, and that she was to reconvey the property upon payment to her of $1,000 and interest.

The plaintiff excepted to evidence of William and Harry explaining the actual transaction, in so far as it tended to contradict the deposition given by Adeline. The plaintiff basing its right to recover upon fraud, the court received the evidence of Harry and William showing the actual transactions which took place between them and considered this evidence in connection with the evidence of Adeline as given in her deposition.

*Smith & Smith* (*Raymond U. Smith* orally), for the plaintiff.

*Charles H. Hosford* and *Charles B. Hibbard* (*Mr. Hibbard* orally), for the defendants.

PEASLEE, J. The plaintiff in interest seeks to hold the land in question upon one of two grounds. He claims, first, that there was a secret trust, or, second, that there was a failure of the parties to the conveyance to agree upon the terms of the contract, so that there was no sale of the land and therefore the supposed grantor is still the owner.

In order to create a secret trust of the nature denounced by the law, there must be some agreement or understanding whereby the transaction is different from what it appears to be. There was no such mutual understanding here. The grantor understood that he was selling the land outright and that the money he received was in payment of the purchase price. What he said and did was in the expression of this understanding and is not capable of any other construction. The finding of the presiding justice that there was no secret trust is amply supported by the reported facts. A so-called trust is implied from the retention of possession by the vendor, because there is an undisclosed agreement. The facts are not as they appear to be. There must be a benefit reserved to the vendor or else there is no secret trust. *Coburn* v. *Pickering*, 3 N. H. 415, 424. To constitute such reservation there must be an agreement of the parties; not necessarily an agreement expressed in language, but nevertheless one expressed in some way, either by language or by conduct. *Putnam* v. *Osgood*, 52 N. H. 148. This element is lacking in the present case, and the plaintiff cannot prevail upon his first ground.

The contention that the mere mental attitude of the defendant Adeline is enough to create a trust cannot be adopted. Something more than this is required. Her undisclosed mental state did not amount to an agreement with her son, nor create an estoppel, either legal or moral, in his favor or for the benefit of his creditors. *Prescott* v. *Jones*, 69 N. H. 305. The secret trust consists either of a holding out of the debtor as owning what he does not own, or of giving him rights in property apparently owned by another. The trust here claimed to exist is of the latter class. No case has been found either holding or suggesting that such a trust can be created by the act of one party only. The lowest terms in which it is stated are that there must be "a secret understanding between the parties." *Coburn* v. *Pickering*, 3 N. H. 415, 425. Adeline's intent amounted to no more than a purpose to make a gift to William. As this intent did not enter into their negotiations, or induce the conveyance to her, his creditors cannot complain.

*Cureton* v. *Doby*, 10 Rich. Eq. 411; *Crawfordsville etc. Bank* v. *Carter*, 89 Ind. 317; *Hesse* v. *Barrett*, 41 Ore. 202.

It is next claimed that if there was no secret trust, then there was no agreement at all. A contract involves what is called a meeting of the minds of the parties. But this does not mean that they must have arrived at a common mental state touching the matter in hand. The standard by which their conduct is judged and their rights are limited is not internal, but external. In the absence of fraud or incapacity, the question is: what did the party say and do? "The making of a contract does not depend upon the state of the parties' minds; it depends on their overt acts." Holmes Com. Law 307; *Mansfield* v. *Hodgdon*, 147 Mass. 304. "We are to fix the person with such expressed consequences as are the reasonable result of his volition." 4 Wig. Ev., s. 2413.

Thus, it was decided in *Gale* v. *Insurance Co.*, 41 N. H. 170, that one who takes out a second policy of fire insurance while the earlier one is in force cannot avoid the effect of his conduct by showing that he never intended to have the policies in force at the same time. "We think it very clear that a policy issued upon his own application cannot be affected by any mere intention or secret determination of his own mind, not communicated to others. Its effect must depend on, and be determined by, his acts and declarations communicated to others." *Ib.* 174.

There are cases in this state which may seem to deny this doctrine and to hold that the unexpressed intent is of controlling importance. The holding in *Norris* v. *Morrill*, 40 N. H. 395, 401, that there can be no demand unless there be an intent to make one, should be read in the light of the connection in which it was announced. The maker of the demand was seeking to prove it. In that situation it might well be that he could not claim beyond what he intended to express. But the case is not an authority for the proposition that, if his words and acts showed a demand, the other party could be deprived of any benefit accruing therefrom by proof that the maker did not intend a demand. That there was no purpose to decide that the unexpressed intent controls the overt action is shown by the decision, shortly thereafter, in *Gale* v. *Insurance Co.*, 41 N. H. 170.

In *Hale* v. *Taylor*, 45 N. H. 405, the application which had been made of the rule that intent may be testified to was questioned, and the important principle that it had no place in cases where the party is estopped to deny the ordinary meaning of his conduct

is noticed. *Delano* v. *Goodwin*, 48 N. H. 203, defines the limits within which proof of intent is allowed in those cases. "The admissibility of a party's evidence as to how he understood a contract cannot depend upon the grounds of that understanding, though these grounds may often be very important in determining the credit to be given to such evidence. Whether his understanding is founded on personal knowledge, or hearsay, is of no consequence in point of law, provided it actually concurs with the other party's understanding; and if it does not so concur, then his testimony on this point is immaterial, except in cases of estoppel where the party claiming that the other is estopped would have to show how he himself understood the contract, and then show that the other party induced him to entertain and act upon that understanding." *Jeremiah Smith*, J., at *p.* 206.

Where a concurring intent is proved, it is merely a short way of showing that by conduct mutually intelligible the parties have expressed themselves each to the other. *Ross* v. *Knox*, 71 N. H. 249. But when the intent does not concur, it is immaterial. Recourse must then be had to the external facts from which intent is usually judged. It must be shown by the words and acts of the parties. Cases where there is an estoppel form a large part of all that arise. The statement or offer of one party, acted upon by the other, is the typical case of making a contract.

Evidence of intent may be competent in certain cases as proof of what was in fact the overt conduct of the party. If it is possible to reproduce conversation exactly, yet the manner may often be as important. It may be incapable of reproduction, and some light may be thrown upon it by showing the intent with which the words were spoken. But after this evidence is admitted the final question to be decided is not what the secret intent was, but what intent was expressed by the overt conduct, taken as a whole. *Fiske* v. *Gowing*, 61 N. H. 431.

It is argued that the finding that the minds of the parties "never actually met upon the transaction as it appears from the papers" shows that there was no contract. This finding, if taken to mean a conclusion of law, is in direct conflict with the earlier one: that the defendant, after the proposal was explained to her, expressed satisfaction, paid the purchase price, and recorded the deed. These facts show that in law the minds of the parties did meet, so far as such meeting is an essential element in making a contract.

"It is elementary in the law governing contracts of sale and all

other contracts, that the agreement is to be ascertained exclusively from the conduct of the parties and the language used when it is made, as applied to the subject-matter and to known usages. The assent must be mutual, and the union of minds is ascertained by some medium of communication. A proposal is made by one party and is acceded to by the other in some kind of language mutually intelligible, and this is mutual assent. Met. Cont. 14. A party cannot escape the natural and reasonable interpretation which must be put on what he says and does, by showing that his words were used and his acts done with a different and undisclosed intention. . . . It is not the secret purpose, but the expressed intention, which must govern in the absence of fraud and mutual mistake. A party is estopped to deny that the intention communicated to the other side was his real intention." *Stoddard* v. *Ham,* 129 Mass. 383, 384, 385. "What is meant by 'meeting of minds' is the agreement reached by the parties and expressed." *Hudson* v. *Company,* 137 Mich. 255, 257.

The facts found show that there was a contract between these parties. The vendor proposed to sell at a price named, executed a deed, and delivered it to the vendee's representative. This representative in turn explained the transaction to the purchaser, who expressed satisfaction therewith, paid the purchase price, and had the deed recorded. The words and acts of the parties are susceptible of but one construction. They show a complete agreement and a full execution of the contract. The effect of this is not destroyed by proof that one party misunderstood the legal effect of what they said and did. *Clark* v. *Lillie,* 39 Vt. 405; *Borden* v. *Railroad,* 113 N. C. 570; *Harris* v. *Company,* 97 Ga. 465; *Durgin* v. *Smith,* 133 Mich. 331; *Wilbur Stock Food Co.* v. *Bridges,* 160 Mo. App. 122; 4 Wig. Ev., s. 2423.

The finding that the minds of the parties did not meet is explained by other findings accompanying it. The meaning is that there was a unilateral mistake as to the effect of the contract which had been made. If this could ever be a ground for affording relief from the agreement entered into, it would be only at the instance of the mistaken party. Such a situation would not make the contract a nullity. At most, the contract could only be treated as voidable, and that at the option of the party who acted upon an erroneous belief. Until that party saw fit to take action, the contract would stand like any other one where the element of mistake did not exist. *Nelson* v. *Hall,* 60 N. H. 274. Whether

the law as to mistake was correctly applied in that case need not now be considered. Assuming that it was, it does not entitle this plaintiff to relief. If in the present case the defendant Adeline could avoid the contract, she has not sought to do so. On the contrary, after she was informed of her error she elected to stand on the contract as made. This election was not the inception of her title. It did not make the contract. The contract existed from the time she first expressed her assent to it. If it was liable to be avoided by her, it was in force until so avoided.

This situation does not create a secret trust. The claim of the plaintiff to hold the land because of a defect in Adeline's assent to the sale rests upon the proposition that there was no contract and therefore the land continued to be William's property. To prevail upon this ground, he must of course show that no sale was made. A mere showing that the sale was voidable by her gives the plaintiff no rights until she elects to avoid.

The exception to the testimony of William and Harry Woods "so far as it tended to contradict the deposition given by Adeline" must be overruled. What was said and done between the parties is a vital question in the case. As to these matters, the testimony of William and Harry was direct evidence, and no reason is perceived why it should not be received. There is no rule of law which prevents a party from proving, if he can, that testimony he has adduced is erroneous. The rule that he shall not impeach his own witness does not mean that he cannot introduce otherwise competent evidence, merely because he has theretofore put in other evidence of a contradictory tenor. The authorities are all the other way. *Swamscot Machine Co.* v. *Walker*, 22 N. H. 457, and authorities cited. Her understanding of the transaction was not an essential fact in the final disposition of the case. If it was an evidentiary fact, tending to show what took place between her and her son, it was not conclusive of that issue, but was subject to modification or contradiction by other competent evidence of the transactions between them. The deposition was not a statement upon which the adverse party had acted, so as to estop her from afterward denying it. It was merely a piece of evidence, subject to the rules applicable to testimony in general.

There was no error in the conclusion reached in the superior court that the bill should be dismissed.

*Exceptions overruled.*

All concurred.

MEMORANDUM.

On the twenty-fifth day of November, 1913, Mr. WILLIAM ALBERTO PLUMMER was appointed an associate justice of the court to fill the vacancy occasioned by the resignation of Mr. Justice BINGHAM, and took his seat upon the bench at the January session, 1914.