**John A. NEWMAN, Appellant,**

v.

**Irwin SCHIFF, Appellee.**

**John A. NEWMAN, Appellee,**

v.

**Irwin SCHIFF, Appellant.**

**Nos. 84–1856, 84–1976.**

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1985.

Decided Nov. 27, 1985.

John A. Newman, St. Louis, Mo., for appellant.

Benson A. Snaider, New Haven, Conn., for appellee.

Before HEANEY, Circuit Judge, BRIGHT, Senior Circuit Judge, and ARNOLD, Circuit Judge.

BRIGHT, Senior Circuit Judge.

John A. Newman, an attorney practicing law in St. Louis, Missouri, brought this action against Irwin Schiff of Hamden, Connecticut, alleging breach of contract. Newman claimed that Schiff had made a public offer of reward to anyone who could cite any section of the Internal Revenue Code that says an individual is required to file an income tax return. Newman asserted that he accepted Schiff's offer, and that Schiff breached the contract by failing to pay him the reward. The district court[1] ruled in favor of Schiff by finding that Newman's acceptance was not timely, and Newman appeals. We affirm the judgment of the district court.

## I. BACKGROUND.

Irwin Schiff is a self-styled "tax rebel", who has made a career and substantial profits out of his tax protest activities.[2] Schiff's basic contention is that the federal income tax is a voluntary tax which no one is required to pay.[3] Schiff has prepared various books and materials espousing his point of view, including *The Tax Rebel's Guide to the Constitution and Declaration of Independence*, *The Freedom Kit* ("For those wanting the original work that ignited the tax rebellion * * * "), *The Biggest Con: How the Government is Fleecing You*, and *How Anyone Can Stop Pay-*

---

1. The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri.

2. Schiff refers to himself as an "economist and constitutionalist", and as "America's leading un-

tax expert." He recently served four months in prison for failing to file federal income tax returns.

3. This position is meritless. *See infra*, p. 467.

*ing Income Taxes* ("The amazing new best seller that exposes the fraud and deception by which the IRS extracts income taxes from uninformed Americans ... and shows you how you can PUT A STOP TO IT– NOW!"). He has promoted his books by appearing on over five hundred radio and television programs, including Larry King's national radio talk show, Tom Snyder's "Tomorrow" show, and "The David Susskind Show," and by giving lectures in over sixty cities. Schiff claims that his activities have caused over 100,000 people to no longer file or pay income taxes.

On February 7, 1983, Irwin Schiff appeared live on CBS News Nightwatch (Nightwatch), a nighttime television program with a viewer participation format. Schiff was interviewed by host Karen Stone from approximately 3:00 a.m. to 4:00 a.m. Eastern Time. The words "Nightwatch Phone-In" and the telephone number (212) 955–9555 were flashed on the screen periodically during Schiff's appearance. In addition, Ms. Stone repeated the telephone number and encouraged viewers to call and speak directly with Schiff on the air.

During the course of the Nightwatch program, Schiff repeated his long-standing position that, "there is nothing in the Internal Revenue Code which I have here, which

says anybody is legally required to pay the tax." Following a discussion of his rationale for that conclusion, Schiff stated: "If anybody calls this show—I have the Code— and cites any section of this Code that says an individual is required to file a tax return, I will pay them $100,000."

Newman did not see Schiff's live appearance on Nightwatch. He did, however, see a two-minute taped segment of the original Nightwatch interview that was rebroadcast several hours later on the CBS Morning News. The CBS Morning News rebroadcast included Schiff's reward proposal.[4]

Newman felt certain that Schiff's statements regarding the Internal Revenue Code were incorrect. Upon arriving at work that day, he researched the issue and located several sections of the Code that to his satisfaction demonstrated the mandatory nature of the federal income tax system. The next day Newman telephoned CBS Morning News and cited the following provisions of the Internal Revenue Code as authority for his position that individuals are required to pay federal income tax: 26 U.S.C. §§ 1, 6012, 6151, 6153, 7201, 7202 and 7203. Newman placed his call to (212) 975–4321, the number given him by the long distance operator for CBS in New York. He then reduced this conversation

4. The following is a partial transcript of the CBS Morning News rebroadcast of Schiff's Nightwatch appearance:

> DIANE SAWYER [Morning News commentator]: Benjamin Franklin said nothing is certain in this world but death and taxes. Irwin Schiff has gone a long way to try to disprove the second part of that certainty, because Schiff says no one really has to pay taxes, and he talked about that this morning with Karen Stone on the CBS News broadcast NIGHTWATCH.
> [Thereafter, the following was replayed in part]:
> KAREN STONE: Why do you object to the federal income tax?
> IRWIN SCHIFF: Well, first of all, there's two reasons I object to it, on legal grounds, and I object to it on economic grounds. But first of all—legally, the income tax is a voluntary tax. There's nothing in the Internal Revenue Code, which I have here, which says anybody's legally required to pay the tax. It's a voluntary tax, and if it were mandatory, it would be unconstitutional. Now, the question is why—

> * * * * * *
> STONE: But you went to jail for four months and paid a $10,000 fine. So in essence, haven't you really paid your federal income taxes for those years that you didn't file?
> SCHIFF: No. No. No, no. That was a fine, and I'm going to be getting that back. We'll be suing the government—
> * * * * * *
> STONE: Now—okay—Every year—you know, we all get our 1040s in the mail or go pick them up, and you're saying that—that we are tricked into believing that we—
> SCHIFF: You're required to file.
> STONE: That we're required to file.
> SCHIFF: Absolutely. *If anybody calls this show—I have the Code—and cites any section of this Code that says an individual is required to file a tax return, I'll pay them $100,000.* The fact of the matter is that you're not required to file. The income tax is voluntary, and it's not that I say it—(emphasis added).

to writing and sent it to the CBS Morning News.[5] Newman's letter stated that it represented "performance of the consideration requested by Mr. Schiff in exchange for his promise to pay $100,000."

CBS responded to Newman's letter on March 3, 1983, informing him that a copy of it had been forwarded to Schiff at Freedom Press. On April 13, 1983, after not hearing from Schiff for over a month, Newman wrote to him at Freedom Press. Newman repeated the portion of his previous letter which discussed Internal Revenue Code provisions that stand for the mandatory nature of the federal tax system. He then reiterated his claim for the $100,000 reward.

On April 20, 1983, Schiff wrote to Newman and stated that: "[y]our letter to Mr. O'Regan at CBS Morning News was forwarded to me. I did make an offer on the February 7, 1983 news (which was actually part of an interview conducted earlier in the week)." Schiff said, however, that Newman had not properly accepted his offer for both substantive and procedural reasons.[6]

Newman then sued Schiff in federal district court for breach of contract. The district court decided that: (1) Schiff intended for his offer to remain open only until the conclusion of the live Nightwatch broadcast; (2) the rebroadcast on CBS Morning News did not renew or extend Schiff's offer; and therefore (3) Newman's acceptance of the offer was untimely. The district court went on to state that Schiff's argument that there is no requirement for individuals to file a tax return is "blatant nonsense."

Newman moved for additional findings of fact and an amendment of judgment.

---

**5.** The text of Newman's letter to the CBS Morning News, dated February 8, 1983, reads as follows:

> This letter is in response to a statement made by Mr. Erwin [sic] Schiff, who was a guest on the CBS Morning News on Monday, February 7, 1983. During the interview, Mr. Schiff, who regards himself as a tax protestor, stated that the Internal Revenue Code did not mandate the payment of tax. Mr. Schiff presented a copy of the Code, declaring that if anyone could find any provision in the Code making the payment of tax mandatory, he would pay that person $100,000.
>
> In response to Mr. Schiff's offer, I have located the pertinent portions of the Internal Revenue Code mandating the payment of tax. Code section 1 "imposes" tax on individuals according to their respective income levels and filing status. Code section 6012 provides that individuals meeting certain income threshholds [sic] "shall" file a return. Webster's New Collegiate Dictionary states that "shall," when used in laws or regulations, constitutes a directive "to express what is mandatory." Code section 6151 provides that persons required to make returns "shall ... pay such tax ... at the time and place for filing the return." Section 6653 imposes various civil penalties for "failure to pay tax," the severity of which depends on the taxpayer's degree of culpability. Finally, Code sections 7201, 7202 and 7203 impose criminal sanctions, including fines and imprisonment, for failure to pay tax imposed by the Code.
>
> In light of the foregoing, it is clear that our system of taxation is indeed mandatory and that we are required to pay tax. This letter is intended to constitute performance of the consideration requested by Mr. Schiff in exchange for his promise to pay $100,000.
>
> I am communicating directly with CBS in this matter because the offer was extended over the CBS network and your staff was unable to provide Mr. Schiff's own address. I will, of course, look solely to Mr. Schiff for performance of his promise. Meanwhile, could you please send me a copy of the relevant portions of the program transcript, and Mr. Schiff's address if it can be located?

**6.** The text of Schiff's letter to Newman, dated April 20, 1983, reads as follows:

> Your letter to Mr. O'Regan at CBS Morning News was forwarded to me. I did make an offer on the February 7, 1983 news (which was actually part of an interview conducted earlier in the week). That offer was to pay $100,000 to the *first* person who could produce a section of the code that states anyone is *required* to file.
>
> You did not produce a section that states an individual is *required* to file a return. Section 6012 *does not* state anyone is required to file as explained in my book (see attachment). In addition, my offer was extended beginning last October and I had received numerous letters claiming that same section of the code as proof prior to the February 8 date of your letter (which obviously had to be mailed after February 8). Since that letter was dated after receipt of others naming the same code you did, you would not, in any case, be eligible even if that section proved that individuals were required to file.

The district court did not alter its judgment, but did make additional conclusions. The district court decided that Schiff ratified the CBS Morning News rebroadcast of his original Nightwatch offer by failing to object after learning of the rebroadcast, by accepting the benefits of the added publicity, and expressly by his letter dated April 20, 1983. The district court said that the ratification constituted a renewal of Schiff's original offer. Nevertheless, it decided that Newman's failure to respond on the morning of the rebroadcast meant that his acceptance was still untimely. This appeal followed.

## II. DISCUSSION.

Newman contends that the district court applied the wrong standard in judging the timeliness of his response to the rebroadcast. We do not reach the issue of timeliness, however, because we conclude that the district court erred by ruling that Schiff renewed his Nightwatch offer through ratifying the CBS Morning News rebroadcast. Consequently, we affirm the judgment of the district court on grounds that Newman did not accept Schiff's initial and only offer that had been made on the Nightwatch program.

### A. The Requirement of Mutual Assent.

It is a basic legal principle that mutual assent is necessary for the formation of a contract. A significant doctrinal struggle in the development of contract law re-

volved around whether it was a party's actual or apparent assent that was necessary. This was a struggle between subjective and objective theorists. The subjectivists looked to actual assent.[7] Both parties had to actually assent to an agreement for there to be a contract. External acts were merely necessary evidence to prove or disprove the requisite state of mind. The familiar cliche was that a contract required a "meeting of the minds"[8] of the parties. 1 S. Williston, *Williston on Contracts* § 22, at 48 (3d ed. 1957). The objectivists, on the other hand, looked to apparent assent. The expression of mutual assent, and not the assent itself, was the essential element in the formation of a contract. As the court in *Woburn National Bank v. Woods*, 77 N.H. 172, 89 A. 491 (1914), said:

A contract involves what is called a meeting of the minds of the parties. But this does not mean that they must have arrived at a common mental state touching the matter in hand. The standard by which their conduct is judged and their rights are limited is not internal, but external. * * * [T]he question is: What did the party say and do? "The making of a contract does not depend upon the state of the parties' minds; it depends on their overt acts."

*Id.* at 175, 89 A. at 492.

The Missouri Court of Appeals[9] issued a classic decision that illustrates the objective theory of assent.[10] *Embry v. Hargadine-McKittrick Dry Goods Co.*, 127 Mo.

7. For a history of the subjective theory of assent, and its eventual displacement, see M. Horwitz, *The Transformation of American Law 1780–1860*, 180–88 (1977); Williston, *Mutual Assent in the Formation of Contracts*, 14 Ill.L.Rev. 85 (1919); *Ricketts v. Pennsylvania R.R.*, 153 F.2d 757, 760 (2d Cir.1946) (Frank, J., concurring).

8. We agree with Professor Farnsworth that this abused metaphor should be abandoned. He traces its origins to a "faulty etymology", under which it was wrongly assumed that the word "agreement" was derived from *aggregatio mentium*, a meeting of the minds. *See* Farnsworth, *"Meaning" in the Law of Contracts*, 76 Yale L.J. 939, 943–44 (1967).

9. We, of course, observe that in the case before us jurisdiction is based upon diversity of citizenship and Missouri law applies.

10. *Lucy v. Zehmer*, 196 Va. 493, 84 S.E.2d 516 (1954) provides another example of the objective approach. The Lucys brought suit for the specific performance of an alleged contract for the sale of a farm. The Zehmers responded that their offer had been made in jest. The Virginia Supreme Court of Appeals held that it is the outward expression of assent, rather than actual mental assent, that is necessary for the formation of a contract. *Id.* at 502, 84 S.E.2d at 521. The court noted that there were many factors which made it reasonable for the Lucys to assume that they had entered into a binding contract, and therefore it ruled in their favor. *Id.* at 501, 84 S.E.2d at 521.

App. 383, 105 S.W. 777 (1907). The case concerned an alleged oral employment contract. Embry was an employee of the Hargadine-McKittrick Dry Goods Company under a written contract to expire December 15, 1903. Embry contended that on December 23, 1903 he spoke with Mr. McKittrick, the company's president, and was re-employed for one year. Approximately two months later Embry was discharged. He sued for breach of contract. The dispute centered on the meaning of the December 23rd conversation between Embry and McKittrick. The trial court required the jury, in order to decide there was a contract, "not only to find the conversation occurred as [Embry] swore, but that both parties intended by such conversation to contract with each other * * *." *Id.* at 387, 105 S.W. at 778. Embry challenged this instruction and the court of appeals reversed. It said that insofar as "intention is an influential element, it is only such intention as the words or acts of the parties indicate * * *." *Id.* at 388, 105 S.W. at 778. Therefore, the court of appeals ruled that the trial "court erred in making the formation of a contract depend on a finding that both parties intended to make one." *Id.* at 392, 105 S.W. at 780. It held that "though McKittrick may not have intended to employ Embry * * * if what McKittrick said would have been taken by a reasonable man to be an employment, and Embry so understood it, it constituted a valid contract of employment for the ensuing year." *Id.* at 390, 105 S.W. at 779.

By the end of the nineteenth century the objective approach to the mutual assent requirement had become predominant, and courts continue to use it today. E. Allan Farnsworth, *Contracts* § 3.6, at 114 (1982).

Professor Corbin states the rule in the following manner:

> The great majority of contracts are bargaining contracts, the purpose of which is to effect an exchange of promises or of other performances. To attain this purpose, there must be mutual *expressions* of assent to the exchange. These expressions must be in agreement * * *.

1 A. Corbin, *Corbin on Contracts* § 107, at 478 (1963) (emphasis added). This does not mean, however, that courts should completely ignore the actual and proven assent of either of the parties.[11] 1 A. Corbin, *supra* § 106, at 477 (1963). *See also* Eisenberg, *The Responsive Model of Contract Law*, 36 Stan.L.Rev. 1107 (1984); Farnsworth, *"Meaning" in the Law of Contracts*, 76 Yale L.J. 939, 945–51 (1967).

**B. The Mechanics of Mutual Assent: Offer and Acceptance.**

Courts determine whether the parties expressed their assent to a contract by analyzing their agreement process in terms of offer and acceptance. An offer is the "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement (Second) of Contracts* § 24 (1981). *Coffman Industries, Inc. v. Gorman-Taber Co.*, 521 S.W.2d 763, 768 (Mo. Ct.App.1975).

The present case concerns a special type of offer: an offer for a reward. At least since the time of Lilli Carlill's unfortunate experience with the Carbolic Smoke Ball, courts have enforced public offers to pay rewards. *Carlill v. Carbolic Smoke Ball Co.*, (1892) 2 Q.B. 484, *aff'd*, (1893) 1 Q.B. 256 (C.A.1892). In that case, frequently excerpted and discussed in student law-

---

**11.** The extreme position that the actual intentions of the parties are irrelevant is exemplified by Judge Learned Hand's frequently quoted dictum:

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If,

however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes on them, he would still be held, unless there were mutual mistake, or something else of the sort.

*Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd*, 201 F. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913).

books, the Carbolic Smoke Ball Company advertised that it would pay a "100£ reward" to anyone who contracted "the increasing epidemic influenza, colds, or any disease caused by taking cold, after having used the Carbolic Smoke Ball three times daily for two weeks according to the printed directions supplied with each ball." *Id.* Ms. Carlill, relying upon this promise, purchased and used a Carbolic Smoke Ball. It did not, however, prevent her from catching the flu. The court held that the advertised reward constituted a valid offer which Ms. Carlill had accepted, thereby entitling her to recovery.

The Missouri courts enforced a public reward offer in a case concerning the notorious desperado Jesse James. Rudy Turilli, operator of the "Jesse James Museum," appeared before a nationwide televised audience and offered $10,000 to anyone who could disprove his contention that Jesse James was not murdered in 1882, but in fact lived for many years thereafter under the alias J. Frank Dalton and last resided with Turilli at his museum into the 1950's. Stella James, a relative of Jesse James, accepted the challenge and produced affidavits of persons who had identified Jesse James' body after the shooting in 1882. Turilli denied that the evidence satisfied the requisite degree of proof and refused to pay the $10,000. The trial court ruled that Ms. James was entitled to the reward, and the Missouri Court of Appeals upheld this judgment. *James v. Turilli,* 473 S.W.2d 757, 763 (Mo.Ct.App.1971).

### 1. The Nightwatch Offer.

In the present case, Schiff's statement on Nightwatch that he would pay $100,000 to anyone who called the show and cited any section of the Internal Revenue Code "that says an individual is required to file a tax return" constituted a valid offer for a reward. In our view, if anyone had called the show and cited the code sections that Newman produced, a contract would have been formed and Schiff would have been obligated to pay the $100,000 reward, for his bluff would have been properly called.

### 2. The CBS Morning News Rebroadcast.

■ Newman, however, never saw the live CBS Nightwatch program upon which Schiff appeared and this lawsuit is not predicated on Schiff's Nightwatch offer. Newman saw the CBS Morning News rebroadcast of Schiff's Nightwatch appearance. This rebroadcast served not to renew or extend Schiff's offer, but rather only to inform viewers that Schiff had made an offer on Nightwatch. The rebroadcast constituted a newsreport and not a renewal of the original offer. An offeror is the master of his offer and it is clear that Schiff by his words, "If anybody calls this show * * *", limited his offer in time to remain open only until the conclusion of the live Nightwatch broadcast. A reasonable person listening to the news rebroadcast could not conclude that the above language—"calls this show"—constituted a new offer; rather than what it actually was, a newsreport of the offer previously made, which had already expired.

The district court further concluded, however, that Schiff's conduct subsequent to the rebroadcast and his letter of April 20, 1983 were a ratification of the CBS Morning News rebroadcast and constituted a renewal of the Nightwatch offer. We disagree.

Schiff's conduct and letter should not be analyzed under the rubric of ratification. Instead they are pertinent to the initial question of whether the CBS Morning News rebroadcast was an offer. As we discussed above, this question is to be decided using an objective approach without completely disregarding the actual and proven assent of either of the parties. Here, in Schiff's letter, we have a statement indicating that the rebroadcast may have been an offer. If Schiff believed that the rebroadcast was an offer, then that belief would tend to make it appear more reasonable for Newman to have reached the same conclusion. We note, however, that both Schiff's conduct and his letter are indefinite. He still denied the obligation. Schiff's conduct and correspondence do not

change the facts that the rebroadcast was merely a newsreport and that it was not reasonable for the hearer to construe the newsreport as a new offer.

### C. Ratification.

Even if we were to analyze Schiff's letter and conduct using ratification principles, we would reach a different conclusion than the district court.

Under Missouri law ratification is an express or implied adoption or confirmation by one person, with knowledge of all material matters, of an act performed on his behalf by another who lacked the authority to do so. *Hyken v. Travelers Insurance Co.*, 678 S.W.2d 454, 459 (Mo.Ct.App.1984); *Wilks v. Stone*, 339 S.W.2d 590, 595 (Mo. Ct.App.1960); *Restatement (Second) of Agency* § 82 (1958). Ratification relates back and is the equivalent of authority at the commencement of the act. In a typical situation an agent, without authority, enters into a contract on the principal's behalf and the principal later ratifies the contract thereby agreeing to be bound by the agent's action. Ratification may occur either expressly or indirectly through conduct of the party. *Wilks v. Stone, supra,* 339 S.W.2d at 595. *See also Weber v. Towner County,* 565 F.2d 1001, 1008–09 (8th Cir.1977).

Ratification serves to authorize that which was unauthorized. Ratification cannot, however, give legal significance to an act which was a nullity from the start. If, for example, an agent enters into a contract lacking in consideration, subsequent ratification by the principal cannot, by itself, create a valid contract. *See* W. Seavey, *Handbook of the Law of Agency* § 33, at 61 (1964).

Applying these principles to the present case, we conclude that Schiff did not renew his Nightwatch offer by ratifying the CBS Morning News rebroadcast. Schiff may have ratified (*i.e.* authorized) CBS's *act* of rebroadcasting an excerpt of his Nightwatch interview, yet this did not give the rebroadcast legal effect as a renewed offer. The rebroadcast itself was not an offer, only a newsreport. Schiff's subsequent conduct and letter do not convert it into an offer.

### D. Mandatory Nature of the Federal Income Tax System.

Schiff's claim that there is nothing in the Internal Revenue Code that requires an individual to file a federal income tax return demands comment. The kindest thing that can be said about Schiff's promotion of this idea is that he is grossly mistaken or a mere pretender to knowledge in income taxation. We have nothing but praise for Mr. Newman's efforts which have helped bring this to light.

Section 6012 of the Internal Revenue Code is entitled "Persons required to make returns of income," and provides that individuals having a gross income in excess of a certain amount "shall" file tax returns for the taxable year. 26 U.S.C. § 6012. Thus, section 6012 requires certain individuals to file tax returns. *United States v. Drefke,* 707 F.2d 978, 981 (8th Cir.), *cert. denied,* 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 321 (1983).

The district court stated that Schiff's argument is "blatant nonsense." Schiff did not challenge this ruling in his cross-appeal.

### III. CONCLUSION.

We affirm the judgment of the district court for the reasons discussed above.

Although Newman has not "won" his lawsuit in the traditional sense of recovering a reward that he sought, he has accomplished an important goal in the public interest of unmasking the "blatant nonsense" dispensed by Schiff. For that he deserves great commendation from the public. Perhaps now CBS and other communication media who have given Schiff's mistaken views widespread publicity, *see supra,* pp. 461–62, will give John Newman equal time in the public interest.

Affirmed but without any costs against John Newman.