**UNITED HARDWARE DISTRIBUTING CO., Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. No. 4–86–284.**

United States District Court,
D. Minnesota,
Fourth Division.

June 28, 1988.

Paul Van Valkenburg, Wayne A. Hergott, Robert B. Fering, Moss & Barnett, Minneapolis, Minn., for plaintiff.

Jerome G. Arnold, U.S. Atty., and James E. Lackner, Asst. U.S. Atty., Minneapolis, Minn., Peter V. Taylor, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on cross motions for summary judgment on stipulated facts. Defendant's motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied.

## FACTS

This is a dispute over the timing of certain of plaintiff United Hardware Distributing Co.'s (United) federal income tax deductions resulting from its write down of the value of items in its inventory. The parties have stipulated to the following facts:

1. Plaintiff, United Hardware Distributing Company ("the Company") is incorporated under the laws of the State of Minnesota.

2. Jurisdiction is conferred upon the Court by Title 28, § 1346(a)(1) of the United States Code.

3. The Company is engaged in the wholesale hardware business, and its primary business is to sell, at wholesale, hardware and related products to retail hardware dealers under the "Hardware Hank" trade name. Some of the Company's merchandise is seasonal in nature, e.g., snow shovels, lawn mowers, and snow blowers.

4. Near the end of each of the three fiscal years at issue, the Company conducted an inventory of its hardware and related products.

5. The method by which the Company values its inventory is the lower-of-cost-or-market method, as allowed under Treasury Regulation § 1.471–2(c). This is in keeping with generally accepted accounting principles.

6. At the end of taxable years 1981, 1982 and 1983, which was November 30 of each of said years, the Company reduced on its books the value of some of the items in its inventory from cost to what the Company refers to as "net realizable value." For purposes of this stipulation, "net realizable value" means what the Company estimated to be the price to which the item would have to be reduced in order to sell, less the estimated costs of selling the item.

7. The Company's agents and employees reduced the value of that part of its inventory, referred to in paragraph 6, *supra*, based upon what the company determined to be obsolescence and/or unsaleability at the full price.

8. Some of the items that the Company reduced to "net realizable value" were offered for sale, at the marked down prices, within thirty (30) days after inventory. The Internal Revenue Service allowed the Company's deductions for such items which are, therefore, not at issue here.

9. The dispute here is limited to those items which the Company reduced to "net realizable value," but which were not offered for sale, at the reduced prices, until sometime subsequent to the 91st day after the inventory. With regard to those items, the Internal Revenue Service did not allow the deductions until the following fiscal year, *i.e.*, the year in which the items were actually offered for sale at the reduced prices.

10. .... [T]he parties agree [1] that the testimony would show that the reasons the Company did not offer the items, referred to in paragraph 9, *supra*, for sale at the reduced prices within 30 days after the inventory was because the merchandise was seasonal in nature, and the Company did not believe it would be able to sell it at that time of year. The

---

1. The government has objected to the facts of this paragraph on relevancy grounds. The Court concludes the information is relevant.

Company based this belief on its long-existing policy of discouraging its dealers from building an inventory of out-of-season items. Another reason the Company did not offer the items, referred to in paragraph 9, *supra*, for sale at reduced prices within 30 days after the inventory was because it did not want its dealers expending their available purchasing dollars on out-of-season items that would be warehoused, and thereby depleting the cash available for new products the company was offering its dealers.

11. The Company's customers, *i.e.*, the dealers, were made aware of product prices through the Company's catalogs and special mailings. The items referred to in paragraph 9, *supra*, and which are at issue here, continued to be shown in the Company's catalogs at their pre-markdown prices for more than 90 days after the inventory and, in some cases, for up to nine months. Moreover, with regard to those items, no special mailings were sent out for more than 90 days after inventory and, in some cases, for up to nine months after inventory.

12. .... [T]he parties agree [2] that the testimony would show that when the Company marked down the values of the items referred to in paragraph 9, *supra*, it changed the prices on its computer so any subsequent sale would be at the reduced price. The reduced prices were not changed in the catalog until the portion of the catalog which carried the items was reprinted on its regularly scheduled basis, which is done by department on approximately a monthly basis. Various portions of the catalog could not be reprinted within 30 days of the inventory, and not all of the special mailings could be made within 30 days of the inventory.

13. The Internal Revenue Service has not challenged the particular items reduced by the Company, or the amount of each such reduction. The issue is limited to timing, *i.e.*, for which fiscal year can

the reduction in value of the inventory be deducted, for federal income tax purposes.

14. The Company filed proper claims for refunds, and after more than six months elapsed since the claims were filed and no action was taken by the Internal Revenue Service, the Company commenced this litigation.

15. If the deductions are allowed, the income taxes for the year 1981 are reduced, and the Company is entitled to recover, $143,830. The Company's taxes for the years 1982 and 1983 are increased, and the Company will pay for those years income taxes of $58,342 and $4,785, respectively. The net effect of allowing the deductions for the three years is to grant the Company a refund of $80,703 which is the amount of the deficiency paid by the Company on September 4, 1985; plus a refund of $69,123, which is the amount of interest on the deficiency which was also paid by the Company on September 4, 1985; plus interest on the total of those two sums ($149,826) from September 4, 1985.

## DISCUSSION

Inventory accounting is governed by sections 26 U.S.C. §§ 446 and 471 of the Internal Revenue Code of 1954.[3] Section 446(a) provides that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 471, which generally governs inventories, provides:

> Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

2. See note 1 above.

3. As the government notes the Tax Reform Act of 1986 (Pub.L. 99–514, Oct. 22, 1986) redesignated the 1954 Code as the Internal Revenue Code

of 1986. Because the tax years at issue are before 1986, they are still controlled by the 1954 Code.

Section 471 establishes two tests to which inventories must conform. First the inventory must conform to the best accounting practice in the taxpayer's trade or business. This element is not in dispute. Second, the inventory must clearly reflect income. The government contends that United's valuation of its inventory in 1981, 1982 and 1983 did not clearly reflect income for tax accounting purposes.

It is axiomatic that under sections 446 and 471 the Commissioner of Internal Revenue (Commissioner) has broad discretion in determining whether or not the taxpayer's method of inventory accounting clearly reflects the taxpayer's income. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532, 99 S.Ct. 773, 780, 58 L.Ed.2d 785 (1979). Although the Commissioner's discretion is not unbridled, his decision must be sustained "unless clearly unlawful." *Thor*, 439 U.S. at 532, 99 S.Ct. at 780.

The parties have agreed that United values its inventory under the "lower of cost or market" method of inventory accounting. Stipulation, par. 5. This method of inventory accounting is governed by Treasury Regulation § 1.471–4, 26 C.F.R. § 1.471–4. *Thor*, 439 U.S. at 533–34, 99 S.Ct. at 781–82. The regulation defines market as "the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer." Treas.Reg. § 1.471–4(a). The treasury regulations authorize the taxpayer to value inventory at below "market" in two situations. One of those situations involves goods which are "unsalable at normal prices or unusable in the normal way because of damage, imperfections ... or other similar causes." Treas.Reg. § 1.471–2(c). That is the situation at issue on the facts of this case. Stipulation, par. 7.

Treasury Regulation § 1.471–2(c) provides that when goods are unsalable at normal prices they should be valued at "bona fide selling prices less direct cost of disposition." The regulation defines "bona fide selling price" as an *"actual offering of goods during a period ending not later than 30 days after inventory date."* (Emphasis added.) In this case the Commissioner disallowed United's deductions for certain inventory until the following fiscal year on the grounds that United had failed to make an actual offering of those goods within 30 days of the taking of the inventory. The parties agree that certain marked down items were not offered for sale at reduced prices until 91 days to nine months after inventory. Stipulation, par. 9. The parties further agree that during this time period United continued to advertise these items in its catalogs at pre-markdown prices.

United concedes, as it must, that under the 30–day offer-for-sale requirement of Treas.Reg. § 1.471–2(c), it is not entitled to the deduction for the disputed items in the fiscal years in which it took the deduction. It contends, however, that the requirement is arbitrary and capricious, and therefore invalid, because it is not rationally related to the clearly reflective of income standard of section 471. Alternatively, it contends that it is entitled to an exception from application of the 30–day offer-for-sale requirement on the facts of this case.

A. *Validity of the Thirty–Day Offer–For–Sale Requirement*

■ By virtue of 26 U.S.C. § 471 Congress delegated to the Commissioner the task of prescribing the method of inventory accounting for tax purposes. The accompanying regulations by which the Commissioner has accomplished this task " 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes,' and 'should not be overruled except for weighty reasons.' " *Thor*, 439 U.S. at 533 n. 11, 99 S.Ct. at 781, *quoting Bingler v. Johnson*, 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969); *see also National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519 (1979) (noting that Supreme Court customarily defers to regulations which implement congressional mandate in some reasonable manner).

In *National Muffler*, the Court explained that it deferred to such regulations

because "Congress has delegated to the ... Commissioner [of Internal Revenue], not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 U.S.C. § 7805(a)." *United States v. Correll*, 389 U.S. [299] at 307 [88 S.Ct. 445, 450, 19 L.Ed.2d 537.] That delegation helps ensure that in "this area of limitless factual variations," *ibid.*, like cases will be treated alike. It also helps guarantee that the rules will be written by "masters of the subject," *United States v. Moore*, 95 U.S. 760, 763 [5 OTTO 760, 24 L.Ed. 588] (1878), who will be responsible for putting the rules into effect.

440 U.S. at 477, 99 S.Ct. at 1307.

United argues that the 30–day offer-for-sale requirement is not rationally related to the statutory requirement that the method of inventory accounting clearly reflect income. It contends that because the purpose of the requirement is to provide some objective evidence of the price a taxpayer sets for devalued inventory, the rule should not be rigidly applied in cases in which other objective evidence of market value exists. In this case, United suggests that the fact that it entered the reduced prices into its computer data bank is such objective evidence which the Commissioner must take into account because any dealer who would have ordered the items in question would have received them at the reduced prices. The Court rejects this argument.

■ As a matter of law, the Court notes the Commissioner is entitled to use a hard and fast rule to govern inventory accounting, in light of the "well-known potential for tax avoidance that is inherent in inventory accounting," *Thor*, 439 U.S. at 538, 99 S.Ct. at 784, and in order to promote consistency by ensuring that "like cases will be treated alike." *National Muffler*, 440 U.S. at 477, 99 S.Ct. at 1307. Such a conclusion is buttressed by the fact that Treas. Reg. § 1.471–2(c) was promulgated at a time "substantially contemporaneous" with

the original enactment of section 471.[4] As the Supreme Court stated in *National Muffler*, 440 U.S. at 477, 99 S.Ct. at 1307 "[a] regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent." Similarly, the fact that the regulation has been in force for more than 65 years and has been consistently applied by the Commissioner also weighs heavily in favor of validity. *National Muffler*, 440 U.S. at 472, 99 S.Ct. at 1304. Simply put, United has failed to carry its heavy burden of showing that the regulation is not reasonably related to the task which Congress has entrusted to the Commissioner.

■ Moreover, as a factual matter, the Court finds that United's entry of the new prices into the computer did not constitute an offer for sale. The stipulated facts are that "[t]he Company's customers, *i.e.*, the dealers, were made aware of product prices through the Company's catalogs and special mailings." Stipulation, par. 11. Thus, the dealers had no way of knowing what prices United had in its computer. As the government points out, such unilateral activity does not constitute an offer for sale under traditional contract doctrine. *See Newman v. Schiff*, 778 F.2d 460, 465 (8th Cir.1985) (noting that for purposes of contract law an offer is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it"), *quoting Restatement (Second) of Contracts*, § 24 (1981). In addition, United's assertion that its entry of the new prices into its computer system constitutes objective evidence of reduced value is not supported by the evidence for the fiscal year in which the deductions are sought. The record indicates that United reduced the disputed items to a "net realizable value," which the parties agree was based on United's estimate of what the price of that item needed to be in order to sell it less the costs of disposal.

---

**4.** The regulation was first enacted in March 1922, and made retroactive to 1920. *Cleveland Automobile Co. v. United States*, 70 F.2d 365, 366 n. 1 (6th Cir.), *cert. denied*, 293 U.S. 563, 55 S.Ct. 88, 79 L.Ed.2d 663 (1934). Section 471 was enacted as part of the Revenue Act of 1918. *Id.*

Stipulation, par. 6. Absent an actual offer, however, the Commissioner is entirely justified in concluding that a subjective estimate of value does not clearly reflect income. Without "evidence of actual offerings, actual sales, or actual contract cancellations .... a taxpayer's assertions as to the 'market value' of its inventory are not cognizable in computing its income tax." *Thor*, 439 U.S. at 535, 99 S.Ct. at 782. *See also Goldberger, Inc. v. Commissioner*, 88 T.C. 1532, 1551 (1987) (same).

**B.** *The Availability of an Exception to the Thirty–Day Offer–for–Sale Requirement*

■ United's second line of attack is to argue that even if Treas.Reg. § 1.471–2(c) is valid, United should be granted an exception from the 30–day offer-for-sale requirement on the grounds that (1) no demand existed for the goods at the time of the taking of the inventory, and (2) that it would have been impossible for United to offer the disputed items for sale within 30 days.[5] United relies on *Queen City Woodworks & Lumber Co. v. Crooks*, 7 F.Supp. 684 (S.D.Mo.1934) for its argument. In *Queen City*, the court found that the version of section 1.471–2(c) then in effect (which incorporated a 30–day offer-for-sale requirement) did not apply because the goods in question were completely obsolete. *Queen City*, 7 F.Supp. at 685. Thus, the court concluded that it would be unfair to strictly enforce the offer-for-sale requirement where the goods had no resale value and thus could not be resold. *Id.*

*Queen City* is readily distinguishable from the facts of this case. Here, the disputed goods did have resale value, and were in fact ultimately resold. *See Goldberger*, 88 T.C. at 1555 (*Queen City* exception did not apply where inventory in question was not completely worthless). United's contention that no demand existed for the goods at the time is not sufficient to bring it within the *Queen City* exception. The facts are only that United did not

believe it could sell the disputed items at the time due to their seasonal nature, not that the goods could not have been sold. Stipulation, par. 10. Moreover, the record indicates that the lack of a market for such goods was not due to lack of demand, but rather due to United's conscious policy choice of discouraging dealers from building an inventory of out-of-season items. Stipulation, par. 10. Finally, whether or not the goods would have been purchased within 30 days is irrelevant to the inquiry under Treas.Reg. § 1.471–2(c). All that matters is whether United offered the goods for sale within that time, and this it did not do.

United's contention that it could not have complied with the 30–day offer-for-sale requirement is similarly unpersuasive. The record reflects only that various portions of the catalog could not be reprinted within 30 days and not all of the special mailings could be made within that time. There is no evidence that it would have been impossible to reprint part of its catalog covering at least some of the disputed items, and completing some special mailings to cover others. It is just as, if not more likely than the reason the goods were not offered for sale within 30 days is that United did not want to offer those goods for sale due to its own marketing policy.

Based on the foregoing, and upon review of all the files, records, proceedings and arguments of counsel,

IT IS ORDERED that:

1. plaintiff's motion for summary judgment is denied; and

2. defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

5. United argues that the fact that it could not have complied with the 30–day requirement bears on the issue of the validity of the regulation. The Court finds it more appropriate to consider this argument on the issue of whether an exception to the general rule should lie on the facts of this case.