T.C. Memo. 2014-43

UNITED STATES TAX COURT

GARY KAPLAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25652-12.                    Filed March 13, 2014.

<u>David I. Faust</u>, for petitioner.

<u>Frederick C. Mutter</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioner did not file Federal income tax returns nor make any tax payments for 2004 and 2005, the years at issue.  Pursuant to his authority under section 6020(b)[1], respondent prepared substitutes for returns for both years.

_____

[1]Unless otherwise indicated, section references are to the Internal Revenue

(continued...)

[*2] In a notice of deficiency, respondent determined the following income tax deficiencies and additions to tax:

| | | | Additions to tax | |
|---|---|---|---|---|
| Year | Tax | Sec. 6654 | Sec. 6651(a)(1) | Sec. 6651(a)(2) |
| 2004 | $16,944,855 | $485,572 | $3,812,592 | $4,236,214 |
| 2005 | 7,424,638 | 297,514 | 1,670,544 | 1,856,160 |

Petitioner resided in Missouri when he timely petitioned this Court. The issues before us are:

(1) whether for the years at issue petitioner is liable for self-employment tax on his income as a consultant for BetOnSports, PLC, and capital gains tax from the sale of shares of BetOnSports, PLC. We hold that he is; and

(2) whether for the years at issue petitioner is liable for additions to tax under section 6651(a)(1) for failure to file timely, under section 6651(a)(2) for failure to pay tax timely, and under section 6654 for failure to make estimated tax payments. We hold that he is.

---

[1](...continued)
Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]                              FINDINGS OF FACT

Petitioner is a citizen of the United States by birth. After finishing the eleventh grade, petitioner dropped out of high school. At the time, he had two young children, had no job, and was making money illegally "on the side" by sportsbooking.

1.    BetOnSports

In approximately 1989 petitioner and several others began operating an illegal sportsbooking business in New York City called BetOnSports. After being arrested in New York City on sportsbooking charges in 1993, petitioner moved the operation of BetOnSports to Florida. In 1995 petitioner saw a street advertisement which stated: "Legal licensed sportsbooking in Aruba, Grand Occidental". Petitioner had friends in the sportsbooking industry, one of whom knew the owner of Grand Occidental. After speaking with the owner of Grand Occidental, petitioner moved BetOnSports' operations to Aruba, Netherlands, Antilles.

In or around 1997 petitioner moved BetOnSports' operations to Antigua, which had a bigger sportsbooking industry. However, because of Antigua's poor infrastructure and high telecommunication costs, petitioner soon began looking for a place to which to relocate his business. After considering several sportsbooking hubs, petitioner settled upon Costa Rica because he believed it to be a good place

[*4] to live and raise his family. In 1998 petitioner moved BetOnSports' operations to Costa Rica. Petitioner and his family stayed in Costa Rica for over 10 years.

BetOnSports was a very successful operation. By 2004 BetOnSports had call centers in Costa Rica and the Dominican Republic and at various times employed 1,500 to 2,000 people. By 2006 it was one of the largest sports wagering businesses in the world. Although BetOnSports took sports wagers from all over the world, approximately 98% of those wagers came from the United States.[2] In addition, BetOnSports' primary focus was American football, which accounted for approximately 42% of its bets by value.

Before July 2004 BetOnSports' assets were held by Boulder Overseas Corp. (Boulder), a corporation that petitioner wholly owned. In July 2004 BetOnSports, PLC (PLC) went public on the London Stock Exchange. In order to effect the initial public offering (IPO), PLC purchased the assets of BetOnSports from Boulder in exchange for shares of PLC and cash. In anticipation of the IPO, petitioner transferred his shares in Boulder to several trusts based in the Isle of

---

[2]At trial petitioner maintained that at the time, he did not believe that his operation of BetOnSports outside of the United States was illegal. During his time overseas petitioner obtained sportsbooking licenses from Aruba, Antigua, Costa Rica, England, and the Dominican Republic. According to petitioner, he believed that these licenses allowed him to accept wagers from the United States.

[*5] Jersey (Bird Trusts).[3] Petitioner was the protector of the Bird Trusts, and Basel Trust Corp. (Channel Islands) Ltd. (Basel), was the sole trustee from the date of their creation through at least July 17, 2006. Petitioner and his family were the intended beneficiaries of the Bird Trusts. From the date of their creation until petitioner's indictment in 2006, the Bird Trusts made discretionary distributions to petitioner and his family on which they lived.

In connection with its IPO, PLC issued a prospectus which disclosed in a section titled "Risk Factors":

> In general, persons and organizations engaged in the business of sports betting in the US via the telephone or internet are in violation of existing US federal laws, including (but not limited to) the 1961 Interstate Wireless Act (commonly known as the "Federal Wire Act"). In addition, most US states also prohibit telephone and internet sports betting * * *

> In an attempt to circumvent the laws of the US, a number of sportsbooks have established their operations in jurisdictions outside of the US where their sportsbook activities are licensed. The US courts have previously held that existing US laws do apply to sportsbooks and online casinos which are licensed abroad and operate outside the US but which take bets that originate in the US. In 2000 a US citizen who operated an online sportsbook based and licensed in Antigua and who had returned to the US was convicted under the Federal Wire Act and sentenced to 21 months imprisonment.

---

[3]Petitioner claims that he placed BetOnSports in trust on the advice of his attorney and the investment bankers handling the IPO in order to shield the company's assets from general creditors.

**[*6]** As part of PLC's IPO petitioner sold 19 million PLC shares through Boulder for approximately $48 million and transferred the proceeds into various bank and investment accounts in Switzerland and the Isle of Jersey. In July 2005 petitioner sold another 23 million PLC shares through Boulder for approximately $49 million and again transferred the proceeds into various bank and investment accounts in Switzerland and the Isle of Jersey. Boulder had no basis in any of these PLC shares.

Following PLC's IPO petitioner was retained as a consultant for PLC and was paid $150,000 in both 2004 and 2005.[4] PLC ceased operations in mid-2006.

2.      Criminal Case

On June 1, 2006, petitioner and several other individuals were indicted on a number of counts related to BetOnSports' sportsbooking activities. As part of the third superseding (and final) indictment,[5] the Government alleged: 1 count of Racketeer Influenced and Corrupt Organizations (RICO) conspiracy, 4 counts of mail fraud, 10 counts of use of wire communication to transmit bets, 1 count of

[4]The parties stipulate that this income constitutes self-employment income.

[5]The original indictment was replaced by a superseding indictment on June 28, 2007; a second superseding indictment on September 3, 2008; and finally a third superseding indictment on September 4, 2008. The original indictment included several counts of tax evasion for wagering excise taxes, which were later dropped in the second superseding indictment.

[*7] interstate transportation of gambling paraphernalia, 1 count of conspiracy to violate the Wire Wager Act, 1 count of RICO forfeiture, and 1 count of non-RICO forfeiture. For these offenses, the Government sought a sentence of 75 to 100 years of imprisonment and criminal forfeiture of $180 million, including but not limited to petitioner's interests in Boulder, PLC, and other sportsbooking entities; several trusts; a number of Swiss bank accounts; a helicopter; a beach house, and a farm. The Government also sought and obtained freezes on petitioner's overseas trusts in the Isle of Jersey and bank accounts in Switzerland.[6]

Steven Muchnick, an Assistant U.S. Attorney (AUSA) for the Eastern District of Missouri, worked extensively on petitioner's criminal case, along with AUSA Michael Fagan and U.S. Department of Justice (DOJ) attorney Marty Woelfle. In or around 2008 AUSA Fagan and DOJ attorney Woelfle withdrew from the case and were replaced by AUSA Steven Holtshouser and Special AUSA Charles Birmingham. Joseph Ludewig and Travis Ardury, special agents from the

---

[6]On May 24, 2007, at the request of the U.S. Department of Justice (DOJ), the Royal Court of Jersey (Channel Islands) issued an order freezing all assets of the Bird Trusts, including proceeds from the sales of PLC shares in 2004 and 2005, which were held in Swiss bank accounts. On February 22, 2008, at the request of the DOJ, the Swiss Government froze the funds in Swiss bank accounts owned directly or indirectly by the Bird Trusts. On April 29, 2009, the Royal Court of Jersey lifted the freeze on the Bird Trusts' assets.

**[*8]** Internal Revenue Service (IRS) Criminal Investigations Division, also assisted in the investigation.

On March 27, 2007, petitioner was arrested and taken into custody in the Dominican Republic and rendered to the United States. Throughout his criminal case, petitioner was represented by a team of lawyers led by defense counsel Chris Flood.

    a.    <u>Plea Agreement</u>

In spring 2009 the Government and petitioner began to engage in substantial plea negotiations. At around this time several of petitioner's codefendants had pleaded guilty, the Isle of Jersey courts had lifted the freeze on petitioner's Isle of Jersey accounts, and petitioner was petitioning Switzerland to lift the freeze on his accounts in Switzerland as well. Each party designated one attorney to participate in the plea negotiations--AUSA Holtshouser for the Government and Mr. Flood for the defendants. AUSA Holtshouer, however, kept AUSA Muchnick informed about the plea negotiations, which focused primarily on two discussion points--prison time and forfeiture amount. AUSA Muchnick was heavily involved in the drafting of petitioner's plea agreement.

[*9] On August 14, 2009, petitioner entered into a plea agreement with the Government.[7] Petitioner's plea agreement provided that in exchange for petitioner's guilty plea to one count of RICO conspiracy, one count of use of wire communication to transmit bets, one count of conspiracy to violate the Wire Wager Act, one count of RICO forfeiture, and one count of non-RICO forfeiture, the Government would dismiss all remaining charges. As part of the agreement, petitioner would forfeit $43,650,000 to the United States and his term of imprisonment would be limited to 41 to 51 months, with credit for time served, regardless of his criminal history category. The Government also agreed that it would request the Swiss Central Authority to lift the freeze on any remaining bank accounts that were frozen at its request, that it would move to withdraw a related motion for contempt sanctions, and that it would remove the lis pendens on the Florida residence of petitioner's parents. Finally, the parties agreed that because of the large forfeiture amount, no fines would be imposed upon petitioner and he would not be required to pay restitution.[8]

---

[7]No trial was held in this case because all the defendants ultimately entered into plea agreements with the Government.

[8]Petitioner was still required to pay a mandatory special assessment of $100 per count for every criminal felony count of which he was convicted.

**[*10]** The relevant provisions of petitioner's plea agreement are set forth below.

Section 1 of the plea agreement, entitled "The Parties", provides:

> The parties to the agreements, recommendations and stipulations contained herein are the defendant Gary Kaplan * * * and the Office of the United States Attorney for the Eastern District of Missouri (hereinafter "the government"). Except where expressly stated otherwise herein, this document and the agreements, recommendations and stipulations contained herein do not, and are not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri.

Section 1, however, further provides that, as an exception,

> the United States Attorney for the Eastern District of Missouri has received authority from the United States Attorney for the Southern District of Florida to make certain commitments referenced herein and said commitments shall be binding on the Southern District of Florida. However, said office is not a signatory to this agreement.

> With regard to the plea agreement's estoppel effect, section 2.A, entitled

"The Plea", provides that

> the Office of the United States Attorney for the Eastern District of Missouri agrees that <u>no further federal prosecution will be brought in this District</u> relative to the defendant's participation in the BETONSPORTS ORGANIZATION, as described in the Third Superseding Indictment, of which the Office of the United States Attorney for the Eastern District of Missouri is aware at this time. In addition, the Office of the United States Attorney for the Eastern [sic] of Missouri and the Office of the United States Attorney for the Southern District of Florida, which has authorized the Eastern District of Missouri to enter into this agreement, agree that no federal prosecution will be brought in either District relative to the defendant's involvement in a business venture known as Hope Mills

[*11] Universal, of which said offices are aware at this time. In addition, the Office of the United States Attorney for the Eastern District of Missouri agrees that <u>no federal criminal tax charges will be brought in this District</u> relative to the defendant's receipt of income from the BETONSPORTS ORGANIZATION, the sale of stock in BetonSports, plc and/or the investment of the proceeds in any such income or sale. [Emphasis added.]

Section 2.E, entitled "Civil or Administrative Actions not Barred, Effect on Other Governmental Agencies", further provides that

> [t]he defendant has discussed with defense counsel and understands that <u>nothing contained in this document is meant to limit the rights and authority of the United States of America to take any civil, civil tax or administrative action</u> against the defendant * * * <u>except that the United States shall not seek civil forfeiture</u> in connection with this case or any asset constituting or derived from the receipt of income from the BetOnSports Organization, the sale of stock in BetOnSports, PLC and/or the investment of the proceeds of any such income or sale. [Emphasis added.]

This exception for forfeiture actions also appeared in section 2.A and section 2.F as follows:

> [I]f the Court at the time of sentencing enters a Final Order of Forfeiture in favor of the United States in the full amount of $43,650,000 * * * then the United States will not seek further civil and criminal forfeiture, restraints or freezes in connection with the allegations contained in the Third Superseding Indictment of any additional assets controlled by the defendant * * *

> \*     \*     \*     \*     \*     \*     \*

**[*12]** The parties agree that the remaining balance of funds and investments held in accounts presently frozen by the Swiss Central Authority * * * are not subject to forfeiture.

Finally, section 10 of the plea agreement includes a standard of interpretation clause, which provides that "[i]n interpreting this document, any drafting errors or ambiguities shall not automatically be construed against any party, whether or not the party was involved in drafting this document", and section 11 includes an integration clause, which provides that "[t]his document constitutes the entire agreement between the defendant and the government."

   b.    Change of Plea Hearing

Also on August 14, 2009, Judge Carol Jackson of the U.S. District Court for the Eastern District of Missouri presided over petitioner's change of plea hearing. AUSAs Muchnick, Holtshouser, and Birmingham were each present at the hearing. AUSA Muchnick testified that the change of plea hearing was more complex and much longer than usual. He explained that unlike most plea agreements, which are nonbinding recommendations to a court, petitioner's plea agreement was of the type specified in rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, such that if the court accepts the plea agreement, the court is bound by its terms.

**[*13]** During the change of plea hearing Judge Jackson asked the parties a number of questions to ensure that she understood the terms of the plea agreement, that the parties understood the terms of the agreement, that the plea agreement represents the entirety of the parties' agreement, and that there was a sufficient factual basis for her to accept petitioner's plea.

Specifically, Judge Jackson asked:

[Court:]  Before you signed this document [the plea agreement], did you review it with your attorneys?

[Petitioner:]  Yes, I thoroughly reviewed this document with the -- with my attorneys.  Yes, I have.

[Court:]  And you read the document before you signed it?

[Petitioner:]  Absolutely.  I have read it.

Throughout the hearing petitioner asked questions and actively sought clarification regarding the nuances of the plea agreement.

At one point AUSA Holtshouser specifically invited the District Court's attention to the provision pertaining to petitioner's civil tax liabilities:[9]

[AUSA Holtshouser:]  Another subject of significance in the agreement is that there is no limitation here on the rights of the United States to take any civil, civil tax, or administrative action.

---

[9]At trial AUSA Muchnick testified that as a general policy, the Department of Justice will not settle a civil tax liability until criminal charges had already been resolved.

[*14] There has been an agreement in the plea agreement that you cover[ed] regarding criminal taxes; but that there is nothing in the agreement that limits that this office lacks the power in any way or the power of the government to pursue any civil, civil tax, or administrative action.

[Court:] Do you understand, Mr. Kaplan, that there is a difference between a criminal tax proceeding and a civil tax proceeding?

[Petitioner:] Yes I do, Your Honor.

[Court:] And in this document, the U.S. Attorney's Office has agreed it will not bring any criminal tax proceeding against you; however, that doesn't preclude the initiation of any civil tax proceeding or administrative action against you.

[Petitioner:] I understand that. And we've agreed to that.

At the end of the hearing the District Court accepted petitioner's guilty plea but did not decide whether it would accept the plea agreement. On October 26, 2009, the District Court issued an order accepting the plea agreement.

c.     Presentencing Report

After a criminal defendant pleads guilty to an offense and before the court's sentencing, the U.S. probation office is required to prepare a presentencing report. The presentencing report contains information about the defendant's general background, descriptions of the relevant offenses and the defendant's role in those offenses, details regarding the victims, discussion of the terms of the plea

[*15] agreement, and analysis regarding the Federal sentencing guidelines, relevant sentencing enhancements, and relevant sentencing reductions. The presentencing report also contains a section which describes the defendant's financial situation, on which the judge may rely in determining whether to impose a fine or restitution and whether the defendant has the ability to pay those monetary sanctions. These financial disclosures are self-reported and are not subject to audit.

Under the plea agreement petitioner was required to completely, truthfully, and accurately disclose his financial situation on various forms that the U.S. probation office provided. Rather than completing the requisite forms, petitioner and Mr. Flood sent the probation officer a financial disclosure in letter format. In this letter petitioner represented that aside from several family loans and substantial legal fees owed to his defense attorneys, he was not aware of any other outstanding liabilities against him. This language was ultimately incorporated into the presentencing report under a section entitled "Financial Condition: Ability to Pay". Neither petitioner nor the Government objected to the presentencing report.[10]

---

[10]At trial AUSA Muchnick credibly testified that the Government was not concerned with the accuracy of petitioner's financial disclosure letter because the

(continued...)

**[\*16]** d.    <u>Sentencing Hearing and Judgment</u>

On November 2, 2009, the District Court held petitioner's sentencing hearing.  Since neither party had objections to the presentencing report, the District Court adopted the report as its findings of fact.  The presentencing report was then filed under seal.  The Government attorneys prosecuting petitioner's case did not share the presentencing report with the IRS.

On the same day the District Court entered a final judgment in petitioner's case.  The judgment provided that petitioner had pleaded guilty to one count of RICO conspiracy, one count of use of wire communication to transmit bets, and one count of conspiracy to violate the Wire Wager Act.  Pursuant to the judgment, the District Court sentenced petitioner to 51 months of imprisonment and ordered petitioner to forfeit $43,650,000 to the United States.

OPINION

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer generally bears the burden of proving by a preponderance of the evidence that the Commissioner's determinations are erroneous.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

---

[10](...continued)
plea agreement did not impose a fine or restitution upon petitioner.

**[*17]** I.     Unreported Income

Gross income includes all income from whatever source derived, unless otherwise specifically excluded.  Sec. 61(a).  The definition of gross income broadly includes any instance of undeniable accessions to wealth, clearly realized, and over which the taxpayer has complete dominion and control.  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

A grantor trust is created when a person contributes cash or property to a trust but retains certain interests such that he is treated as the owner of the trust.  See secs. 671-679.  "When a grantor or other person has certain powers in respect of trust property that are tantamount to dominion and control over such property, the Code 'looks through' the trust form and deems such grantor or other person to be the owner of the trust property and attributes the trust income to such person."  Estate of O'Connor v. Commissioner, 69 T.C. 165, 174 (1977).  Under section 671, the grantor of a grantor trust is treated "as the owner of the trust assets, thus making the trust assets taxable to the grantor, until those trust assets are distributed to the grantee."  Resolution Trust Corp. v. MacKenzie, 60 F.3d 972, 976-977 (2d Cir. 1995).  A grantor trust is disregarded as a separate taxable entity to the extent of the grantor's retained interest, and the grantor must report the trust's income on his own return.  Sec. 671; sec. 1.671-2(b), Income Tax Regs.

**[*18]** Under section 679(a), when a U.S. person directly or indirectly transfers property to a foreign trust and the foreign trust has a U.S. beneficiary, the U.S. person is treated as the owner of the trust with respect to the portion of the trust attributable to the transferred property. A foreign trust is treated as having a U.S. beneficiary for each year in which income of the trust is paid or accumulated to the benefit of, directly or indirectly, a U.S. person. Sec. 1.679-2(a), Income Tax Regs. Petitioner is a U.S. citizen and is thus a U.S. person as defined by section 7701(a)(30)(A). The Bird Trusts, which were organized under the laws of the Isle of Jersey and supervised by the Royal Court of Jersey, are foreign trusts. Sec. 7701(a)(31)(B); sec. 301.7701-7(a), Proced. & Admin. Regs. Finally, during 2004 and 2005, the Bird Trusts distributed portions of their income to petitioner, a U.S. person, on which petitioner and his family lived. Thus, petitioner was a U.S. beneficiary of the Bird Trusts for both years at issue.

On brief petitioner concedes that the Bird Trusts were grantor trusts. Petitioner further concedes that the income of the Bird Trusts was taxable to him as the trusts' grantor under section 679.[11] Petitioner argues, however, that

---

[11]This income and the stipulated self-employment income constitute the entire deficiency amount that respondent determined.

**[\*19]** respondent is precluded from bringing a civil tax action against him by: (1) the statute of limitations; (2) the plea agreement; and (3) judicial estoppel.

A.    Preclusion by Statute of Limitations

Petitioner argues that respondent is precluded from bringing a civil tax action against him for 2004 and 2005 by the statute of limitations.

As a general rule, the Commissioner has three years in which to make an assessment after a return is filed. Sec. 6501(a). When the taxpayer does not file a return, however, the assessment period never begins to run. Sec. 6501(c)(3). A substitute for return prepared under section 6020(b) is not considered a return for the purposes of starting the assessment period. Sec. 301.6501(b)-1(c), Proced. & Admin. Regs.

The parties have stipulated that petitioner did not file Federal income tax returns for 2004 and 2005, and thus the assessment period is still open by statute. Petitioner argues, however, that the IRS' internal policy, set forth in Internal Revenue Manual (IRM) pt. 4.23.12.8 (Dec. 16, 2008), precludes respondent from bringing this action. Petitioner's reliance on IRM pt. 4.23.12.8, which pertains to delinquent return procedures in the employment tax context, is misplaced. Instead, the relevant provision is IRM pt. 4.12.1.3(1) (Oct. 5, 2010), which provides that while the enforcement period is generally limited to six years, longer

[*20] periods are allowed when income from illegal sources is at issue. There can be no dispute that petitioner's tax liabilities for the years at issue arise from the fruits of his illegal gambling business. Therefore, respondent is not barred from pursuing petitioner's 2004 and 2005 tax liability either by the statute of limitations or by IRS policy.

B.     Preclusion by Plea Agreement

Petitioner argues that the plea agreement precludes respondent from bringing a civil tax action against him for 2004 and 2005. At trial petitioner testified that according to his understanding, the plea agreement provided that he would turn over 50% of the BetOnSports proceeds held in trust, he would be subject to 51 months of imprisonment with time served, and the Government would close the case. Petitioner claims that he would never have agreed to surrender half of the trust's assets had he understood that the plea agreement would allow the Government to pursue a civil tax action relating to BetOnSports.[12] Petitioner argues that therefore the plea agreement should be interpreted to allow

---

[12]At trial we heard only testimony from petitioner on behalf of himself. Petitioner did not call as a witness Mr. Flood (nor any other attorney involved with his defense) to testify regarding the negotiation and drafting of the plea agreement. Thus, we may infer that had Mr. Flood been called, his testimony would not have supported petitioner's contentions. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947).

[*21] the Government to pursue a civil tax action only if it does not involve tax liabilities relating to BetOnSports. By way of example, petitioner explains that the Government could bring a civil tax action against him for his other ongoing businesses, including a pharmaceutical company called Hope Mills.

Respondent argues that the plea agreement, by its terms, unambiguously allows the Government to pursue a civil tax action against petitioner. We agree with respondent.

The Court of Appeals for the Eighth Circuit, to which this case is appealable by stipulation of the parties, see sec. 7482(b)(2), has held that "[w]here a plea agreement has been accepted by the court, we generally interpret the meaning of the terms in the agreement according to basic principles of contract law." United States v. Mosley, 505 F.3d 804, 808 (8th Cir. 2007). To the extent there is ambiguity in the plea agreement, a court must construe it against the Government.[13] Id. at 809.

---

[13]Because we determine infra that the plea agreement is unambiguous, we need not decide whether parties to a plea agreement may contract around the legal requirement that ambiguity in a plea agreement be construed against the Government.

**[*22]** Under Missouri law,[14] where the terms of an integrated written agreement are unambiguous, extrinsic evidence may not be introduced to vary or contradict the terms of the agreement.[15] Smith Flooring, Inc. v. Pa. Lumbermens Mut. Ins. Co., 713 F.3d 933, 938 (8th Cir. 2013). Consequently, petitioner's subjective and unspoken beliefs cannot dictate the meaning of an unambiguous contract.[16]

---

[14]Missouri has adopted the Restatement (Second) of Conflict of Laws, sec. 188, which is a general choice-of-law test for use when a contract contains no choice-of-law provision. St. Paul Fire & Marine Ins. Co. v. Bldg. Constr. Enters., Inc., 526 F.3d 1166, 1168 (8th Cir. 2008) (citing Viacom, Inc. v. Transit Cas. Co., 138 S.W.3d 723, 724-725 (Mo. 2004)). Because the plea agreement does not contain a choice-of-law provision, we consider the following factors in determining which State's law applies: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicil, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws, sec. 188 (1971). Applying these factors, we hold that Missouri law governs the interpretation of the plea agreement because it resulted from a criminal prosecution in Missouri, was negotiated and executed in Missouri, and was accepted by a court in Missouri.

[15]Exceptions to this general rule exist for fraud, mutual mistake, accident, or erroneous omission, Smith Flooring, Inc. v. Pa. Lumbermens Mut. Ins. Co., 713 F.3d 933, 938 (8th Cir. 2013), none of which apply in this case.

[16]Even if we were to credit petitioner's claim that he would not have agreed to the plea agreement had he known that the Government could still pursue civil tax liabilities relating to BetOnSports, at most petitioner's claim could render the plea agreement invalid on the basis that there had been no "meeting of the minds". Petitioner, however, does not make this argument. We further note that the Court of Appeals for the Eighth Circuit, in interpreting Missouri law, has stated that "meeting of the minds" is an objective inquiry and "'does not depend upon the

(continued...)

**[\*23]** The parties do not dispute that the plea agreement, which provides "[t]his document constitutes the entire agreement between the defendant and the government", is an integrated agreement. In addition, as explained below, the terms of the plea agreement unambiguously allow the United States to bring a civil tax action against petitioner. Accordingly, we may not consider any extrinsic evidence that contradicts the plain terms of the plea agreement.

Before discussing the relevant provisions of the plea agreement, the Court believes it helpful to explain several legal terms of art, all of which are a form of monetary sanction--i.e., criminal forfeiture, civil forfeiture, fine, and restitution. A criminal forfeiture is "[a] governmental proceeding brought against a person to seize property as punishment for the person's criminal behavior." Black's Law

---

[16](...continued) state of the parties' minds * * * [but rather] on their overt acts.'" Newman v. Schiff, 778 F.2d 460, 464 (8th Cir. 1985) (quoting Woburn Nat'l Bank v. Woods, 89 A. 491, 492 (N.H. 1914)); see also Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc., 347 F.3d 1052, 1054 (8th Cir. 2003) ("On its face, * * * [the phrase "meeting of the minds"] can create the impression that a contract is formed only when the parties to it entertain the same subjective views as to its meaning. That, however, is not the law. * * * Rather, a court looks to the parties' objective manifestations of intent[.]") (Citation omitted); Stoetzel v. Cont'l Textile Corp. of Am., 768 F.2d 217, 221 (8th Cir. 1985) ("'[M]eeting of the minds is to be determined by the expressed, and not by the secret, intention of the parties.'* * * 'If [one's] words or acts * * * manifest an intention to agree * * * it is immaterial what may be the real but unexpressed state of his mind on the subject.'" (quoting Roper v. Clanton, 258 S.W.2d 283, 289 (Mo. Ct. App. 1953)). Petitioner's overt acts did not evidence a lack of meeting of the minds.

[*24] Dictionary 722 (9th ed. 2009).  In contrast, a civil forfeiture is "[a]n in rem proceeding brought by the government against property that either facilitated a crime or was acquired as a result of criminal activity."  Id.  In the criminal penal context, a fine is a "pecuniary criminal punishment * * * payable to the public treasury."  Id. at 708.  Finally, in the criminal penal context, restitution is "full or partial compensation paid by a criminal to a victim * * * ordered as part of a criminal sentence or as a condition of probation."  Id. at 1428.  With the meanings of these terms in mind, we now look to the relevant terms of the plea agreement.

Section 2.E of the plea agreement provides:  "The defendant has discussed with defense counsel and understands that nothing contained in this document is meant to limit the rights and authority of the United States of America to take any civil, civil tax or administrative action against the defendant".  (Emphasis added.)  Petitioner argues, however, that the plea agreement is ambiguous because section 2.E further provides "the United States shall not seek civil forfeiture in connection with this case of any asset constituting or derived from the receipt of income from BetOnSports Organization, the sale of stock in BetOnSports, PLC and/or the investment of the proceeds of any such income or sale."  (Emphasis added.)  We disagree.

[*25] Throughout his criminal case, petitioner was represented by a team of defense lawyers. On the basis of the plea agreement, it is evident that these attorneys understood the distinctions among criminal forfeiture, fines, and restitution. For example, AUSA Muchnick credibly testified that because of the large forfeiture amount, the parties agreed that no fine or restitution would be imposed. We thus conclude that petitioner's attorneys knew, or at least should have known, the legal distinction between a civil tax action and a civil forfeiture action.

Our conclusion is confirmed by the District Court's questioning during petitioner's change of plea hearing, before its acceptance of the plea agreement.

> [Court:] And in this document, the U.S. Attorney's Office has agreed it will not bring any criminal tax proceeding against you; however, that doesn't preclude the initiation of any civil tax proceeding or administrative action against you.
>
> [Petitioner:] I understand that. And we've agreed to that.
>
> [Emphasis added.]

Petitioner argues that his financial disclosure letter, which did not list Federal taxes as a liability and which was incorporated into the presentencing report adopted by the District Court as its findings of fact, demonstrates that the parties and the District Court understood that he had no civil tax liability in

[*26] relation to BetOnSports. Petitioner's argument overreaches. At trial petitioner admitted that the plea agreement does not preclude the United States from instituting a civil tax action against him for taxes unrelated to BetOnSports. However, petitioner's financial disclosure letter did not list any tax liabilities, including tax liabilities relating to his pharmaceutical business, Hope Mills. Therefore, we decline petitioner's invitation to infer, on the basis of an omission in his financial disclosure letter, that he had no civil tax liability.

### C. Preclusion by Judicial Estoppel

Finally, petitioner argues that the doctrine of judicial estoppel precludes respondent from seeking civil tax liabilities for the years at issue.

Under the doctrine of judicial estoppel, once "'a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)). This doctrine "'prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" Id. (quoting Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000)).

[*27] Several factors typically inform a court's decision whether to apply the doctrine of judicial estoppel: (1) whether "a party's later position * * * [is] 'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped". Id. at 750-751 (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982)).

Petitioner argues that the doctrine of judicial estoppel applies in this case because the Government did not object to the presentencing report, which incorporated a section from petitioner's financial disclosure letter that omitted income tax for 2004 and 2005 as a liability. We disagree. The representations in petitioner's financial disclosure letter were petitioner's, not respondent's. AUSA Muchnick credibly testified at trial that such financial disclosures are self-reported and are not subject to audit. AUSA Muchnick further credibly testified that his office did not object to the presentencing report because such representations are used to determine a defendant's ability to pay a fine or restitution, neither of which

[*28] was at issue in petitioner's case. Under these circumstances, the Government did not assert any position through its silence. Furthermore, even if an omission in petitioner's financial disclosure could somehow be construed as a "position" by the Government, the Government did not persuade the District Court nor derive any benefit from such a "position". Finally, because the plea agreement unambiguously reserved the Government's right to bring a civil tax action against petitioner, petitioner suffered no detriment nor prejudice from any perceived "position" of the Government. For these reasons, petitioner's judicial estoppel argument is without merit.

II.     Additions to Tax

Under section 7491(c), the Commissioner bears the burden of production with respect to additions to tax and must come forth with sufficient evidence to show that imposition of the penalty is appropriate. Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

In the notice of deficiency, respondent determined additions to tax for 2004 and 2005 for failure to file tax returns timely under section 6651(a)(1) and failure to pay tax timely under section 6651(a)(2). Respondent further determined additions to tax for failure to make estimated tax payments under section 6654 for both years. The parties have stipulated that petitioner neither filed income tax

[*29] returns nor paid income tax for both years at issue. Moreover, petitioner has not advanced any argument in brief as to these additions to tax. Accordingly, we deem any such arguments to be conceded. See Mendes v. Commissioner, 121 T.C. 308, 313-314 (2003) (holding that arguments not addressed in brief may be considered abandoned); cf. Holmes v. Commissioner, T.C. Memo. 2011-31, 101 T.C.M. (CCH) 1141, 1145 (2011) (holding that the issues of additions to tax under sections 6662(a)(2) and 6654 were deemed conceded where the taxpayer did not specifically address them in his petitions, his pretrial memorandum, or at trial). Accordingly, we sustain respondent's determinations with respect to the additions to tax under sections 6651(a)(1) and (2) and 6654.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered for

respondent.